SIXTY-SEVENTH MINNESOTA STATE SENATE *v.*
BEENS ET AL.

No. 71–1024.  Decided April 29, 1972*

PER CURIAM.

These two appeals are taken by the Minnesota State
Senate from orders of a three-judge Federal District Court

*Together with No. 71–1145, *Sixty-seventh Minnesota State Senate*
v. *Beens et al.*, on appeal from the same court.

reapportioning the Minnesota Legislature. The appeals do not challenge the District Court's conclusion that the legislature is now malapportioned. And at this point they are not concerned with population variances or with other issues of the type customarily presented in reapportionment litigation. The controversy focuses, instead, on (a) the District Court's refusal to honor the Minnesota statute fixing the number of the State's legislative districts at 67 and (b) the court's proceeding, over the initial opposition of all parties (but upon the suggestion of two *amici*, the Lieutenant Governor and a representative), to reduce the number of legislative districts to 35, the number of senators by almost 50%, and the number of representatives by nearly 25%. We conclude that the District Court erred in its rulings. Accordingly, we summarily vacate the court's orders and remand the cases for further proceedings promptly to be pursued.

I

The Minnesota Bicameral Legislature was last effectively apportioned in 1966. Ex. Sess. Laws 1966, c. 1.[1]

---

[1] This was the ninth general reapportionment in Minnesota since the adoption of the State's Constitution in 1857. Initially there were 26 districts, 37 senators, and 80 representatives. Minn. Const. 1857, Schedule § 12 (both versions). The succeeding plans, and the number of districts and legislators they specified, were

|  | Districts | Senators | Representatives |
|---|---|---|---|
| Laws 1860, c. 73 | 21 | 21 | 42 |
| Laws 1866, c. 4 | 22 | 22 | 47 |
| Laws 1871, c. 20 | 41 | 41 | 106 |
| Laws 1881, c. 128 | 47 | 47 | 103 |
| Laws 1889, c. 2 | 54 | 54 | 114 |
| Laws 1897, c. 120 | 63 | 63 | 119 |
| Laws 1913, c. 91 | 67 | 67 | 130 |
| Ex. Sess. Laws 1959, c. 45 | 67 | 67 | 135 |

By Laws 1917, c. 217, the number of representatives was increased

Section 2.021 of Minn. Stat. (1969), the very first section of the 1966 Act, states that, "until a new apportionment shall have been made," the State's senate shall consist of 67 members and its house of representatives of 135 members.[2]   Section 2.031, subd. 1, from the second section of the 1966 Act, prescribes 67 legislative districts for both the senate and the house.[3]   Sections 2.041–2.711, inclusive, then delineate these 67 districts.[4] The State's Constitution, Art. IV, § 2, provides a legislator-population minimum ratio (one senator for every 5,000 inhabitants and one representative for every 2,000 inhabitants) and states, "The representation in both houses shall be apportioned equally throughout the different sections of the state, in proportion to the population thereof."

The 1970 federal census took place in due course. The Minnesota Legislature did not produce a reapportionment act during its regular session in 1971.   One was passed on October 29, 1971, during the reconvening of an extra session called that year.   The lawmakers adjourned *sine die* on October 30.   The Governor, however, vetoed the act on November 1 and

---

by one (the 65th district), but there was no accompanying general reapportionment.

Throughout this entire period of more than a century, the Minnesota Constitution, Art. IV, § 23, has called for reapportionment at the first legislative session after each federal census.   See also *Magraw* v. *Donovan,* 163 F. Supp. 184 (Minn. 1958), and *Honsey* v. *Donovan,* 236 F. Supp. 8 (Minn. 1964).

[2] "2.021 NUMBER OF MEMBERS.  For each legislature, until a new apportionment shall have been made, the senate is composed of 67 members and the house of representatives is composed of 135 members."

[3] "2.031 APPORTIONMENT.  Subdivision 1.  The representatives in the senate and house of representatives are apportioned throughout the state in 67 legislative districts."

[4] Sections 2.041–2.711 were §§ 3–70, inclusive, of the 1966 act.

this 1971 reapportionment endeavor failed to become law.[5] The Governor has not called the legislature to another extra session for more work on reapportionment,[6] and it is not scheduled to meet again in regular session until January 1973. Minn. Const., Art. IV, § 1; Minn. Stat. § 3.01 (1969). The 1972 primary and general elections will take place in the interim. Minn. Stat. §§ 202.02 and 203.02 (1969). Thus, the 1966 statute remains as the State's last effective legislative apportionment.

## II

The original plaintiffs, who are among the appellees here, are three qualified voters of the State. By their complaint, filed in April 1971 and asserting jurisdiction under 28 U. S. C. §§ 1343 (3) and (4) and 42 U. S. C. §§ 1983 and 1988, they sought (a) a declaratory judgment that the 1966 Act apportioning the legislature violates the Equal Protection Clause of the Fourteenth Amendment, (b) an injunction restraining the Minnesota Secretary of State and all county auditors from conducting future elections for legislators pursuant to that Act, and (c) reapportionment of the legislature by the federal court itself. The three-judge court was convened. The appellant, the Sixty-seventh Minnesota State Senate, intervened as a party defendant under Fed. Rule Civ. Proc. 24 (a).

The District Court, after hearings and with the assistance of stipulations, issued three significant orders:

A. On November 15, 1971, it made appropriate findings, not challenged here as to their basic provisions,

---

[5] A legislative reapportionment act is subject to executive veto under Minn. Const., Art. IV, §§ 11 and 12, and Art. V, § 4. *Duxbury* v. *Donovan,* 272 Minn. 424, 138 N. W. 2d 692 (1965).

[6] Power is vested in the Governor to convene both houses of the legislature "on extraordinary occasions." Minn. Const., Art. V, § 4. This power is also recognized by Art. IV, § 1, of the Constitution.

and declared the 1966 Act in its *entirety*, Minn. Stat. §§ 2.021–2.712 (1969), inclusive, violative of the Federal Constitution, enjoined the Secretary of State and the county auditors from conducting future elections under the Act, and appointed two Special Masters (a third was named later) to aid the court in formulating a new apportionment plan. See 336 F. Supp. 715, 718–719.

B. On December 3 it found "that it best can fulfill its duty of apportioning the Minnesota Legislature in accordance with the Constitution of the United States and with due regard for State policy" by dividing the State into 35 senatorial districts and dividing each senatorial district into three house districts, and ordered that the parties, intervenors, and *amici* could present plans for apportioning the legislature accordingly. In an accompanying memorandum the court said, "The only serious questions . . . are whether we have the authority to change the size of the Legislature; and if so, to what extent." It answered the first of these questions in the affirmative, quoting the following sentence from *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971):

> "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." 402 U. S., at 15.

The court stated that the legislature could not be apportioned into 67 senate districts and 135 house districts without violating either the Federal Constitution or the Minnesota Constitution; that the existing practice of dividing one senate district into three house districts and all others into two cannot be continued without violating the requirements of equal protection; that the greater the population of each district, the more closely

can the one man, one vote standard be met and still give effect to the state policy of adhering to the boundaries of political subdivisions; that state policy with respect to the legislature's size "is difficult to discern"; that the Governor had recommended a reduction in size; that there is merit in having an odd-numbered senate and house where, as in Minnesota, the State has "two strong and rather evenly divided political parties"; that federal constitutional and state policy requirements can best be harmonized by having 35 senate districts and by dividing each senate district into three house districts; that there are persuasive arguments that "positive benefits to the State will accrue by substantially reducing the size of the Senate and moderately reducing the size of the House"; and that "it is not our desire to fix for the future the size of the Senate and the House in Minnesota," for the legislature, if it wishes, may appropriately reapportion. See 336 F. Supp., at 720–721.

C. On January 25, 1972, it entered its "Final Order and Plan of Apportionment" by which it adopted a plan therein described. The court also modified its injunction of November 15 so as to enjoin the state secretary and county auditors from conducting any future elections for the legislature under any plan other than the one adopted by the court "or a constitutional plan adopted after this date by the State of Minnesota." In accord with Minn. Const., Art. IV, § 24, 1972 elections under the new plan for all positions in the senate and house were ordered. 336 F. Supp. 715, 732.

The senate, as intervenor, first appealed from the orders of November 15, 1971, and December 3, 1971 (case No. 71–1024), and then from the order of January 25, 1972 (case No. 71–1145). Both appeals are under 28 U. S. C. § 1253. We denied the senate's motion to expedite the appeals, but granted its motion to consoli-

date them. 405 U. S. 985 (1972). We then granted its application for a temporary stay pending further order of the Court. *Post,* p. 905.

### III

The appellees have moved to dismiss. Two grounds are asserted:

A. That the senate lacks authority and standing to prosecute the appeals. It is said that the senate's authorizing resolution does not entitle its counsel to take the appeals; that the resolution relates only to legislative district boundaries and not to their number; that the Office of Senate Counsel speaks only for certain members of the senate and not for the whole; that it is the legislature, and not just the senate, that is the legal entity concerned for purposes of the appeals; and that only the legislature has standing.

The authorizing senate resolution, however, is in broad terms:

> "BE IT RESOLVED, by the Senate of the State of Minnesota, that the Office of Senate Counsel be and it is hereby authorized and directed to take such steps as may be necessary to represent the interests and will of this body to the extent deemed necessary in both state and federal court actions involving the prescription of the bounds of senatorial and representative districts, the apportionment of senators and representatives among those districts, and the orderly process of elections therefrom . . . ." Journal of the Minnesota Senate 1971, 39th Day, p. 460.

The resolution was adopted July 31, 1971, by a 56-to-0 vote. A motion to reconsider made two and a half months later failed by a vote of 33–31. *Id.,* 40th day, at 492.

We are not inclined to read this authorizing resolution restrictively, as the appellees suggest. Certainly the present appeals are in a federal court action that concerns apportionment "and the orderly process of elections therefrom." And certainly the senate is directly affected by the District Court's orders. That the senate is an appropriate legal entity for purpose of intervention and, as a consequence, of an appeal in a case of this kind is settled by our affirmance of *Silver* v. *Jordan,* 241 F. Supp. 576 (SD Cal. 1964), aff'd, 381 U. S. 415 (1965), where it was said:

> "The California State Senate's motion to intervene as a substantially interested party was granted because it would be directly affected by the decree of this court." 241 F. Supp., at 579.

A group of senators thus had the right to intervene. The concurrence of the house was not necessary as it would have been to enact legislation.

B. That the appeals are not from orders granting or denying injunctive relief, within the requirement of 28 U. S. C. § 1253. Although the orders of November 15, 1971, and January 25, 1972, specifically enjoin state and county officers, the appellees assert that the restraining portions of those orders are not now attacked and are conceded by the appellant. This, in our view, is too narrow an analysis. The order of November 15 clearly enjoins the state and county officers "from holding or conducting any future elections under the present Apportionment Statutes." That of January 25 does the same except with respect to the plan then adopted by the court or one thereafter validly adopted by the State. The court's injunctive holding applies to §§ 2.031 and 2.021, respectively fixing the number of legislative districts and the number of senators and representatives, as well as to the succeeding sections determining the

boundaries of the 67 districts. The appellant's appeal relates to §§ 2.031 and 2.021. The court's injunction with respect to those sections is sufficient to justify a direct appeal under § 1253. *Gunn* v. *University Committee,* 399 U. S. 383 (1970), cited by the appellees, is inapposite.

## IV

That the three-judge federal court possesses the power to reapportion the State's legislature when the applicable state statutes fall short of constitutional requirements is not questioned. *Reynolds* v. *Sims,* 377 U. S. 533, 586–587 (1964). The 1966 Minnesota apportionment legislation, the court found, in the light of the 1970 census figures no longer provided a constitutionally acceptable apportionment of either house. No one challenges that basic finding here, and we have no reason to rule otherwise. The 1971 legislature had endeavored to reapportion and, thus, to fulfill the requirement imposed upon it by Art. IV, § 23, of the State's Constitution.[7] See *Magraw* v. *Donovan,* 163 F. Supp. 184, 187–188 (Minn. 1958), and *Honsey* v. *Donovan,* 236 F. Supp. 8 (Minn. 1964). The legislature's efforts in that direction, however, were nullified by the Governor's veto of the Act it passed, an action the executive had the power to take. *Duxbury* v. *Donovan,* 272 Minn. 424, 138 N. W. 2d 692 (1965). The net result was the continuing applicability of the 1966 act. Under these circumstances judicial relief was appropriate.

---

[7] Art. IV, § 23. "The legislature shall have the power to provide by law for an enumeration of the inhabitants of this State, and also have the power at their first session after each enumeration of the inhabitants of this state made by the authority of the United States, to prescribe the bounds of congressional, senatorial and representative districts, and to apportion anew the senators and representatives among the several districts according to the provisions of section second of this article."

The three-judge court, however, was not content with devising judicial apportionment within the framework of the existing and otherwise valid statutory structure. Instead of recognizing the provision in Minn. Stat. § 2.021 (1969), that the state senate "is composed of 67 members and the house of representatives is composed of 135 members," and the further provision in § 2.031 that the senators and representatives "are apportioned throughout the state in 67 legislative districts," the court declared those sections invalid along with §§ 2.041–2.711, the provisions that delineate the boundaries of the specified 67 legislative districts.

We need not review at length the several pronouncements of this Court relating to state legislative reapportionment. The pertinent cases, particularly those of June 15, 1964, and the guidelines they provide are well-known. It suffices to note that in *Reynolds* v. *Sims,* 377 U. S. 533, the Court stated that apportionment "is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites . . . ." 377 U. S., at 586.[8] But we also stated, "With respect to the operation of the Equal Protection Clause, it makes no difference whether a State's apportionment scheme is embodied in its constitution or in statutory provisions," and, then, "Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible." 377 U. S., at 584. And the Minnesota Constitution, Art. IV, § 23, vests the legislature with power to reapportion.

---

[8] In the companion case of *Maryland Committee* v. *Tawes,* 377 U. S. 656, 676, the Court observed again that "primary responsibility for legislative apportionment rests with the legislature itself."

It follows from this that a federal reapportionment court should accommodate the relief ordered to the appropriate provisions of state statutes relating to the legislature's size insofar as is possible. We do not have difficulty, as the District Court professed to have, in discerning the State's policy as to the legislature's size. That policy, long in effect in Minnesota and restated no longer than six years ago in § 2.021, is for 67 senators and 135 representatives, and, in § 2.031, is for 67 legislative districts. These are figures that have been determined by the legislature and approved by the Governor of the State. The present Governor's contrary recommendation, although certainly entitled to thoughtful consideration, represents only the executive's proffered current policy, just as the reapportionment plan he vetoed on November 1, 1971, represented only the legislature's proffered current policy.

We note, in repetition, that the District Court invalidated the entire 1966 Act, §§ 2.021–2.712, despite the fact that the details of the legislative districts' configurations are included only in §§ 2.041–2.711. Section 2.021 merely specifies the number of senators and representatives; § 2.031 calls for the apportionment of those legislators throughout the State in 67 districts; and § 2.712 provided the effective date of the 1966 act, the efficacy of which, for the period prior to the 1970 census, is not at issue here. In the light of the State's policy of statutory severability, Minn. Stat. § 645.20 (1969),[9]

---

[9] "645.20 CONSTRUCTION OF SEVERABLE PROVISIONS. Unless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable. If any provision of a law is found to be unconstitutional and void, the remaining provisions of the law shall remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; or unless the court finds

and recognizing that this specific number of legislative districts has been in effect in Minnesota since 1913 and through two succeeding reapportionments, we necessarily conclude that the District Court's invalidation of the six-year-old reapportionment law swept too broadly in nullifying statutory sections that are capable of standing alone.

We know of no federal constitutional principle or requirement that authorizes a federal reapportioning court to go as far as the District Court did and, thus, to bypass the State's formal judgment as to the proper size of its legislative bodies. No case decided by this Court has gone that far and we have found no district court decision that has employed such radical surgery in reapportionment. There are cases where judicial reapportionment has effectuated minor changes in a legislature's size. Nearly all those cases reflect an increase or decrease of only a few seats [10] and most appear to have been justified

the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent."

The 1966 act did not state that its provisions shall not be severable. In contrast, Minnesota's immediately preceding apportionment act, Ex. Sess. Laws 1959, c. 45, did contain in its § 72 an express non-severability provision; that provision was repealed by c. 1, § 71, of the 1966 act. The legislative intent in 1966 is thus apparent.

[10] *Sims* v. *Amos,* 336 F. Supp. 924, 936, 937 (MD Ala. 1972) (house reduced from 106 to 105 so as to have three times the number of senate seats); *Schaefer* v. *Thomson,* 251 F. Supp. 450 (Wyo. 1965), aff'd, 383 U. S. 269 (1966) (senate increased from 25 to 30 on agreement of the parties and in accord with the state constitution); *Klahr* v. *Goddard,* 250 F. Supp. 537 (Ariz. 1966) (senate reduced from 31 to 30 and house from 80 to 60. The preservation of county lines, as prescribed by the State's constitution, Art. 4, pt. 2, § 1, was an announced consideration in this substantial house reduction which no one opposed. No appeal was taken); *Herweg* v. *Thirty Ninth Legislative Assembly,* 246 F. Supp. 454 (Mont. 1965) (senate reduced from 56 to 55 and house increased from 94

by a state constitutional demand, agreement of the parties, the observance of geographical boundaries, or mathematical convenience. We do not disapprove a court-imposed minor variation from a State's prescribed figure when that change is shown to be necessary to meet constitutional requirements. And we would not oppose the District Court's reducing, in this case, the number of representatives in the Minnesota house from 135 to 134, as the parties apparently have been willing to concede. That action would fit exactly the 67-district pattern. But to slash a state senate's size almost in half and a state house's size by nearly one-fourth is to make more than a mere minor variation. If a change of that extent were acceptable, so, too, would be a federal court's cutting or increasing size by 75% or 90% or, indeed, by prescribing a unicameral legislature for a State· that has always followed the bicameral precedent. We repeat what was said recently in another legislative apportion- · ment case: "The remedial powers of an equity court must be adequate to the task, but they are not unlimited." *Whitcomb* v. *Chavis,* 403 U. S. 124, 161 (1971).

In summary, the number of a State's legislative districts or the number of members in each house of its legislature raises no issue of equal protection unless the

to 104. A constitutional provision, Art. VI, § 3, prohibiting the division of counties, was thereby observed); *Paulson* v. *Meier,* 246 F. Supp. 36 (ND 1965) (senate reduced from 53 to 49 and house from 106 to 98. The State's constitution, Art. II, § 26, mandated a senate of 49 members).

In other cases federal courts have altered the size of existing legislatures by approximating the number of legislators specified in new plans that the courts were nullifying. *Swann* v. *Adams,* 263 F. Supp. 225 (SD Fla. 1967); *WMCA, Inc.* v. *Lomenzo,* 238 F. Supp. 916 (SDNY 1965), aff'd, 382 U. S. 4 (1965). The state policy thus has been effectuated despite the invalidity of the legislature's proposed plan.

number so prescribed occasions significant and invalidating population deviations.

> "Determining the size of its legislative bodies is of course a matter within the discretion of each individual State. Nothing in this opinion should be read as indicating that there are any federal constitutional maximums or minimums on the size of state legislative bodies." *Reynolds* v. *Sims,* 377 U. S., at 581 n. 63.

See also *Connor* v. *Johnson,* 330 F. Supp. 506, 507 (SD Miss.), order stayed on other grounds, 402 U. S. 690, opinion on remand, 330 F. Supp. 521 (SD Miss. 1971); *Bannister* v. *Davis,* 263 F. Supp. 202, 208 (ED La. 1966); *Dungan* v. *Sawyer,* 250 F. Supp. 480, 489 (Nev. 1965).

We conclude that the action of the three-judge court in so drastically changing the number of legislative districts and the size of the respective houses of the Minnesota Legislature is not required by the Federal Constitution and is not justified as an exercise of federal judicial power.

Our ruling here, of course, is no expression of opinion on our part as to what is desirable by way of legislative size for the State of Minnesota or for any other State. It may well be that 67 senators and 135 representatives make a legislature of unwieldy size. That is a matter of state policy. We certainly are not equipped—and it is not our function and task—to effectuate policy of that kind or to evaluate it once it has been determined by the State. Neither is it the function and task of the Federal District Court. Size is for the State to determine in the exercise of its wisdom and in the light of its awareness of the needs and desires of its people.

The orders of the District Court are vacated and the cases are remanded for further proceedings consistent

with this opinion. The District Court is instructed to give this matter priority and to act promptly and forthwith so that the State's 1972 electoral process may get under way with assurance as soon as possible. It is already late in the day, but the maintenance of legislative districts long in effect provides a minimum of disruption even now.[11]

The judgment in these cases shall issue forthwith.

*It is so ordered.*

MR. JUSTICE STEWART, dissenting.

It is undisputed here that the apportionment of the Minnesota State Legislature violated the Equal Protection Clause of the Fourteenth Amendment. Thus, it was incumbent upon the three-judge federal court to devise a constitutional reapportionment, unless and until the Minnesota Legislature and Governor could agree upon and enact a new and constitutional reapportionment of their own. The only question presented by these appeals is whether the three-judge court abused its equitable discretion by devising the reapportionment plan that it did—a plan that called for a reduction in the size of both houses of the state legislature.

There is no doubt that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and

[11] The 1972 general election in Minnesota will take place November 7. The primaries are scheduled for September 12. Candidates may file between July 5 and July 18. A legislative candidate must establish residence in his district by May 7. Minn. Stat. §§ 203.02, 202.02, 202.04; Minn. Const., Art. IV, § 25. Inasmuch as the Minnesota Legislature is nonpartisan, Minn. Stat. § 202.03, subd. 1, the earlier dates for political party precinct caucuses and party conventions have no relevance in these cases. If time presses too seriously, the District Court has the power appropriately to extend the time limitations imposed by state law. See *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15 (1971).

flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15. At the same time "[t]he remedial powers of an equity court . . . are not unlimited." *Whitcomb* v. *Chavis,* 403 U. S. 124, 161. In the reapportionment context, it is the duty of a court seeking to remedy an unconstitutional apportionment to right the constitutional wrong while minimizing disturbance of legitimate state policies.

In these cases, the three-judge court appears conscientiously to have undertaken this task. It clearly recognized that the size of the houses of the Minnesota Legislature set by state statute was a state policy deserving respect. But it also recognized that there were several other legitimate state policies at stake—for one, the conformance of legislative district boundaries to political jurisdictional boundaries. The three-judge court also found that these policies were, unfortunately, in conflict. It stated:

> "The larger the population of each Senate and House District, the more closely can the equal protection (one man-one vote) requirements be met and still give effect to the State policy of adhering to the boundaries of political subdivisions. Conversely, the smaller the population of each district, the greater the likelihood that the deviations will be higher than are acceptable or that artificial boundaries will result."

Faced with this perceived conflict among legitimate state policies, the three-judge court weighed those policies and decided that preservation of political jurisdictional boundaries should take precedence over preservation of the present size of the senate and the house.[1]

---

[1] The court also was careful to recognize another state policy—that there should be an odd number of legislators in each house so as to minimize the risk of tie votes.

Perhaps the three-judge court's assessment of the relative weights of what it saw as competing state policies was mistaken. Perhaps its accommodation of those policies was also mistaken. But those judgments by the three-judge court were based on long and careful study of the distribution of population in Minnesota and of the possible alternative apportionments of the legislature.

This Court chooses to act on these appeals summarily. Yet we do not have before us all the population statistics and jurisdictional and district maps that were before the three-judge court. We do not have the benefit of the reports of the Special Masters that were available to the three-judge court. We do not even have briefs on the merits of these cases. And, of course, we have not heard oral arguments. For these and other reasons we are simply not able at this point even to begin to evaluate the three-judge court's exercise of its remedial power in equity.

Surely, if state policies are in real conflict and if, as the three-judge court found, equal protection requirements cannot be met without sacrificing one of these policies, then the cases are very difficult. I certainly cannot say, on the basis of the information before us, that the three-judge court clearly overstepped its equitable discretion in its resolution of the problem. As the Court recognizes today, there is no rigid and absolute limit on a court's equitable discretion to order changes in the size of legislative bodies in order to remedy an unconstitutional apportionment. Every case is different, and these questions are inevitably questions of degree.

I have disagreed with the Court's Procrustean view of the Fourteenth Amendment's substantive requirement of "one man, one vote." [2] But until and unless those estab-

---

[2] See, e. g., Lucas v. Colorado Gen. Assembly, 377 U. S. 713, 744; Swann v. Adams, 385 U. S. 440, 447. See also Wells v. Rockefeller, 394 U. S. 542, 549.

lished requirements are modified, the federal courts are often going to be faced with hard remedial problems such as those presented here. Difficult problems produce solutions that are difficult to review, even after full briefing and oral argument. I cannot believe that summary action here is either wise or appropriate, and I therefore respectfully dissent.